No. 98-706

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 33

DAN MARSHALL, an individual taxpayer and elector;

MONTANA EDUCATION ASSOCIATION, an unincorporated

labor organization; MONTANA FEDERATION OF TEACHERS,

an unincorporated labor organization; MONTANA SCHOOL

BOARDS ASSOCIATION, an incorporated non-profit membership

organization; MONTANA LEAGUE OF CITIES AND TOWNS,

an incorporated non-profit membership organization; MONTANA

ASSOCIATION OF COUNTIES, an incorporated non-profit membership

organization; MONTANA TAXPAYERS ASSOCIATION, an incorporated

non-profit membership organization; MONTANA STATE AFL-CIO,

an unincorporated labor organization; and MONTANA CHAMBER

OF COMMERCE, an incorporated non-profit membership organization,

Plaintiffs,

v.

STATE OF MONTANA, by and through MIKE COONEY, in his

official capacity as Chief Election Officer, and JOSEPH P. MAZUREK,

in his official capacity as Chief Law Enforcement Officer,

Defendants,

and

JOE BALYEAT, individually and as Chairman of MONTANANS FOR

BETTER GOVERNMENT, P.A.C.,

Intervenors.

ORIGINAL PROCEEDING:

APPLICATION FOR DECLARATORY JUDGMENT and INJUNCTIVE RELIEF

COUNSEL OF RECORD:

For Plaintiffs:

Stanley T. Kaleczyc (argued) and Kimberly A. Beatty (argued); Browning,

Kaleczyc, Berry & Hoven, Helena, Montana

For Defendants:

Mike Cooney, Secretary of State; Daniel J. Whyte, Chief Legal Counsel,

Office of Secretary of State, Helena, Montana

Honorable Joseph P. Mazurek, Attorney General; Clay R. Smith, Solicitor

(argued); Chris D. Tweeten, Assistant Attorney General, Helena, Montana

For Intervenors:

Kenneth H. Gray (argued); Jackson & Rice, Helena, Montana

For *Amicus Curiae*:

Honorable Marc Racicot, Governor (argued); Judy Browning, Chief of Staff,

Helena, Montana

Kyle A. Gray (argued), Jeanne M. Bender; Holland & Hart, Billings, Montana

Elizabeth Brenneman, Litigation Director, American Civil Liberties Union

of Montana, Billings, Montana (for American Civil Liberties Union of

Montana)

Mona Jamison, Elizabeth L. Griffing; The Jamison Law Firm, Helena,

Montana (for Montana Life and Health Insurance Guaranty Association)

Geralyn Driscoll, Office of Public Instruction, Helena, Montana

(for State Superintendent of Public Instruction)

Arthur V. Wittich, Attorney at Law, Bozeman, Montana

(for National Taxpayers Union)

Paul Grant, *pro hac vice*, Attorney at Law, Parker, Colorado

Kenneth H. Gray; Jackson & Rice, Helena, Montana

(for Initiative and Referendum Institute)

Gerald J. Neely, Attorney at Law, Billings, Montana (on his own behalf)

Argued and Submitted: February 16, 1999

Decided: February 24, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1. Plaintiffs challenge the constitutional validity of Constitutional Initiative 75 (CI-75) in an original application for declaratory judgment and injunctive relief.

¶2. We hold that CI-75 violates Article XIV, Section 11, of Montana's Constitution.

¶3. We address the following issue:

¶4. Whether CI-75 violates the separate-vote provision in Article XIV, Section 11, of the Montana Constitution.

Factual and Procedural Background

¶5. On November 3, 1998 Montana voters approved CI-75. As enacted, CI-75 amended Article VIII of the Montana Constitution by adding a new Section 17 that began:

Section 17. People's right to vote on taxes-fairness in tax elections-enforcement.

(1) No new tax or tax increase may be enacted unless first approved by a majority of the electors voting on the measure in the geographic area subject to the tax.

In response to CI-75, Plaintiffs made an original application for declaratory judgment and injunctive relief. This Court accepted jurisdiction in December, 1998.

¶6. In their original application for declaratory judgment and injunctive relief, Plaintiffs set forth seven Counts. Count one alleges that CI-75 violates Article XIV, Section 11, of the Montana Constitution because the provisions of CI-75 make more than one amendment to the Montana Constitution. Count two alleges that CI-75 violates Article V, Section 11(3), of the Montana Constitution because CI-75 has multiple subjects. Count three alleges that CI-75 violates Article XIV, Sections 1-7, of the Montana Constitution because CI-75 constitutes a revision of the Montana Constitution without a Constitutional Convention having been called. Count four alleges that the ballot presented to the electorate violated the right to due process guaranteed by Article II, Section 17, of the Montana Constitution because the ballot did not describe the entirety of the measures proposed by CI-75. Count five appears to allege that in violation of Article II, Section 4, of the Montana Constitution, Plaintiffs have been discriminated against in the exercise of their political rights on

account of their social origin or political ideas. Count six alleges that in violation of Article II, Section 17, of the Montana Constitution certain plaintiffs were prohibited from exercising their right to political speech and association in connection with their opposition to CI-75, and thus denied their right to substantive due process. Count seven alleges that in violation of Article II, Sections 6-7, of the Montana Constitution certain plaintiffs were denied their right to political speech and association in connection with their opposition to CI-75.

¶7. Plaintiffs seek a declaratory judgment that CI-75 is unconstitutional and that the November, 1998 General Election is invalid with respect to CI-75. Plaintiffs further seek a mandatory injunction directing the Secretary of State to decertify the election results regarding CI-75 and a permanent injunction prohibiting the Montana Attorney General from enforcing the provisions of CI-75. Finally, Plaintiffs seek costs and attorney fees and such other relief as this Court deems just and proper.

## Discussion

¶8. Whether CI-75 violates the separate-vote provision in Article XIV, Section 11, of the Montana Constitution.

¶9. Because the issue is dispositive, we address Plaintiffs' argument that CI-75 has two or more constitutional amendments in violation of Article XIV, Section 11, of the Montana Constitution. Article XIV, Section 11, provides:

**Submission.** If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately.

Art. XIV, Sec. 11, Mont. Const.

¶10. Plaintiffs argue that CI-75 violates Article XIV, Section 11, of the Montana Constitution because it either explicitly or implicitly amends at least twelve sections of Montana's Constitution. Further, CI-75 is defective because of its provision that if there is an "irreconcilable" conflict between any part of it and the Montana Constitution, CI-75 prevails. Plaintiffs contend that the effect of CI-75's "irreconcilable conflict" clause is that existing constitutional rights, such as the right to a trial by jury and to a speedy trial, have become conditional rights with effect only so long as the people approve taxes necessary to provide service.

¶11. Plaintiffs contend that this Court's decisions in State v. Board of Com'rs (1906) (hereafter "*Teague*"), 34 Mont. 426, 87 P. 450 and State v. Alderson (1914) (hereafter "*Hay*"), 49 Mont. 387, 142 P. 210, are distinguishable from the present case. In *Hay* and *Teague*, the Court affirmed the validity of constitutional amendments that each had several parts. However, the amendments in *Hay* and *Teague* each affected only one part of the Montana Constitution. In the present case, CI-75 affects many parts of the Montana Constitution. Moreover, the amendments in *Hay* and *Teague* were simple in comparison with CI-75 and its pervasive impacts upon the Montana Constitution.

¶12. Plaintiffs argue that the drafters of Montana's Constitution intended to ensure that voters would not be misled by the title of a constitutional amendment. They urge that Article XIV, Section 11, has a meaning distinct from that of Article V, Section 11 (3), of the Montana Constitution. Plaintiffs contend that constitutional initiatives are subject to both the separate-vote requirement of Article XIV, Section 11, and the single-subject requirement of Article V, Section 11(3). Thus, because CI-75 has many subjects, it violates Article V, Section 11(3); because CI-75 makes more than one amendment of Montana's Constitution, it violates Article XIV, Section 11.

¶13. Plaintiffs rely upon Armatta v. Kitzhaber (Or. 1998), 959 P.2d 49. In *Armatta*, the court addressed a crime victims' rights initiative and distinguished the meanings of two Oregon constitutional provisions that are similar to Article XIV, Section 11, and Article V, Section 11(3), of the Montana Constitution. The *Armatta* court concluded that an Oregon constitutional provision similar to Montana's Article XIV, Section 11, requires that voters not be forced to vote upon multiple constitutional changes in a single vote. The court in *Armatta* also concluded that an Oregon constitutional provision similar to Montana's Article V, Section 11(3), requires that constitutional amendments have a single subject. Plaintiffs appear to urge that this Court follow *Armatta* in recognizing and distinguishing the requirement of a separate vote on each constitutional amendment from the requirement that each constitutional amendment have a single subject.

¶14. Defendants respond that CI-75 is a valid constitutional amendment. Defendants argue that under this Court's decisions construing Article XIX, Section 9, of the 1889 Montana Constitution, CI-75 is valid notwithstanding its different provisions because its provisions are germane to its single purpose. Article XIX, Section 9, provided in part that "[s]hould more amendments than one be submitted at the same election,

they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately." Art. XIX, Sec. 9, Mont. Const. (1889). Defendants contend that the Montana Supreme Court decisions that interpreted Article XIX, Section 9, should also apply to Article XIV, Section 11, of Montana's present Constitution. Defendants assert that CI-75 has one purpose and one subject: "elector approval of new or increased taxes." Thus, the unity of subject in CI-75 satisfies the requirement of Article XIV, Section 11, of the Montana Constitution.

¶15. Defendants rely principally on three Montana decisions. In *Teague*, a constitutional amendment was challenged because it had three separate parts. The *Teague* Court, however, affirmed the amendment, ruling that there were not three separate propositions but rather one single scheme. *See Teague*, 34 Mont. at 430, 87 P. at 451. In *Hay*, the Court also considered an amendment that had several parts and concluded that

[i]f, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment.

*Hay*, 49 Mont. at 404, 142 P. at 213. In Hay, the Court concluded that Article XIX, Section 9, of the 1889 Montana Constitution required that a constitutional amendment have unity of subject. The Hay Court further concluded that "the unity required by this section is served notwithstanding the existence of many provisions in an Act where such provisions are germane to the general subject matter expressed." Hay, 49 Mont. at 405, 142 P. at 213 (emphasis added). Finally, Defendants cite State v. Cooney (1924), 70 Mont. 355, 225 P. 1007, where the Court again considered the validity of a constitutional amendment with multiple parts and concluded:

The fact that an amendment impinges upon or affects various provisions of the Constitution is not in itself persuasive that essential unity was violated in its submission. The real question is whether the operation of the amendment relates to a single plan or purpose.

*Cooney*, 70 Mont. at 365, 225 P. at 1011. Thus, Defendants argue that under Cooney, whether an amendment affects more than one provision of the Constitution is unimportant so long as the operation of the amendment relates to a single purpose or plan. In the present case, Defendants assert that CI-75's provisions are germane to its single subject. Defendants insist that "[w]hat is relevant is that all of the collateral consequences complained of by the plaintiffs derive directly from implementation of [CI-75's] policy determination."

¶16. Defendants distinguish *Armatta* on the grounds that the *Armatta* court made a

distinction between the Oregon constitution's separate-vote and single-subject provisions that this Court has not recognized. Further, Defendants suggest that CI-75 would be valid under *Armatta*. Defendants contend that CI-75 has a single integrated subject but that the constitutional amendment reviewed in *Armatta* addressed not only the procedural rights of crime victims but also disparate, substantive concerns such as the qualifications of jurors and the number of jurors necessary to convict for specific crimes.

**¶17. In determining whether CI-75 violates Montana's Constitution, we interpret Article XIV, Section 11. As the Court in State v. Moody (1924), 71 Mont. 473, 230 P. 575, remarked:**

The object of construction as applied to a written Constitution is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey it.

*Moody*, 71 Mont. at 481, 230 P. at 578 (citation omitted). Article XIV, Section 11 provides that "[i]f more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately." Art. XIV, Sec. 11, Mont. Const. (emphasis added). Thus, the plain language of Article XIV, Section 11, is that each constitutional amendment shall be voted upon separately. Article V, Section 11(3), provides in pertinent part that "[e]ach bill, except general appropriation bills and bills for the codification and general revision of the laws, shall contain only one subject, clearly expressed in its title." Art. V, Sec. 11(3), Mont. Const.

**¶18. However, Defendants urge that this Court be guided by the unity of subject rule, which the Court developed in *Teague*, *Hay*, and *Cooney*, and conclude that Article XIV, Section 11, means not what it plainly says but rather that a constitutional initiative containing more than one amendment is valid provided that it has unity of subject and that its parts are germane to that subject. We disagree. We conclude that the requirement, in Article XIV, Section 11, of a separate vote has a substantively different meaning from the single-subject requirement set forth in Article V, Section 11(3). For several reasons, we further conclude that *Teague*, *Hay*, and *Cooney* should be distinguished from the present case.**

**¶19. First, under the Montana Constitution in effect when *Teague*, *Hay* and *Cooney* were decided, amendments could be proposed in either house of the legislature but no provision was made for constitutional initiatives. *See* Art. XIX, Sec. 9, Mont. Const. (1889) (providing that "[a]mendments to this Constitution may be proposed in**

either house"). The Montana Constitution thereby guaranteed that legislators would debate and deliberate upon any proposed constitutional amendment. For present-day constitutional initiatives, however, there is no guarantee that Montana voters will have similar deliberative opportunities. As the Court in Sawyer Stores v. Mitchell (1936), 103 Mont. 148, 62 P.2d 342, commented: it is instructive to note the difference in the conditions under which a measure is submitted to the electorate of this state. The members of the Legislature meet for the purpose of considering legislation, and for a period of sixty days that, with a few exceptions, is their sole business. The members of that body have the advantage of conference, that is, of conferring together and each gaining from the other such information as each may possess concerning a given measure. . . . The voter to whom a measure is submitted has a business or occupation other than that of the consideration of legislation. The measure is submitted to the banker, the merchant, the farmer, the lawyer, the laborer, the housewife.

*Sawyer Stores*, 103 Mont. at 168, 62 P.2d at 351. We conclude that the separate-vote requirement of Article XIV, Section 11, is a cogent constitutional recognition of the circumstances under which Montana voters receive constitutional initiatives. Nor is the Montana Constitution alone in its recognition of the importance of the separate-vote requirement. CI-75 itself also affirms the import of the separate-vote requirement; it provides that "each ballot issue shall encompass only a single tax."

¶20. Second, the constitutional amendment that the Court considered in *Hay* affected only one provision of the Constitution. *See Hay*, 49 Mont. at 406, 142 P. at 213 (commenting "[o]nly one provision of the Constitution was changed"). In the present case, CI-75 affects multiple parts of Montana's Constitution.

¶21. Third, for purposes of Article XIV, Section 11, the unity of subject rule that the Court applied in *Hay* and *Cooney* is unworkable. Under the Court's rationale in *Hay*, for example, a constitutional initiative to "improve Montana's government" could amend virtually every part of Montana's Constitution but have one single subject. The unity of subject rule set forth in *Hay* and *Cooney* is so elastic that it could swallow Montana's entire Constitution. We decline to affirm such a rule.

¶22. In *Armatta*, we find support for our conclusion that the plain meaning of the Montana Constitution's separate-vote requirement is substantively different from its single-subject requirement. As previously discussed, the court in *Armatta* compared

**two constitutional provisions that are similar to Article XIV, Section 11, and Article V, Section 11(3), of Montana's Constitution. The *Armatta* court concluded**

the separate-vote requirement of Article XVII, section 1, imposes a *narrower* requirement than does the single-subject requirement of Article IV, section 1(2)(d). Such a reading of the separate-vote requirement makes sense, because the act of amending the *constitution* is significantly different from enacting or enabling *legislation.*

*Armatta,* 959 P.2d at 63. *We agree that a separate-vote requirement for constitutional amendments is a different and narrower requirement than is a single-subject requirement. As the Armatta court remarked, a constitutional amendment may be valid under the single-subject rule but fail under the separate-vote requirement. See Armatta,* 959 P.2d at 64.

**¶23. We hold that Article XIV, Section 11, has a substantively different meaning from that of Article V, Section 11(3) of the Montana Constitution. We hold further that the plain meaning of Article XIV, Section 11, requires a separate vote for each constitutional amendment. To the extent that this holding is in conflict with *Hay*[1], *Teague*, and *Cooney*, those decisions are overruled.**

**¶24. Having determined that Article XIV, Section 11, requires a separate vote on each proposed constitutional amendment, we consider whether CI-75 violates that constitutional requirement. We conclude that CI-75 specifically amends three parts of Montana's Constitution. First, CI-75 expressly provides that "Article VIII of the Constitution [Revenue and Finance] . . . is amended." Second, CI-75 amends Article II, Section 18, providing that "[n]otwithstanding any legislative limitation created pursuant to Article II, Section 18, sovereign immunity does not shield public officials or employees from appropriate civil liability for violation of this section." Third, CI-75 provides that "[n]otwithstanding the referendum exception of Article VI, Section 10, before a bill imposing new or increased taxes is referred to the people the governor shall have the veto power."[2] Because CI-75 expressly amends three parts of Montana's Constitution but does not allow a separate vote for each amendment, we hold that CI-75 violates Article XIV, Section 11, of Montana's Constitution. *Compare Sawyer Stores,* 103 Mont. at 173, 62 P.2d at 354 (commenting that "a [ballot] submission is void where two propositions have been submitted so as to have one expression of the voter answer both propositions, and this for the reason that voters might thereby be induced to vote for both propositions who would not have done so if the question had been submitted singly").**

**¶25. Although CI-75 has a severability clause, we reject the notion that objectionable parts of CI-75 may be severed, leaving a valid constitutional amendment in place. During oral argument, Defendants contended that some parts of CI-75 could be severed. The suggestion that offending parts of CI-75 can be severed misconstrues the separate-vote requirement in Article XIV, Section 11. Article XIV, Section 11, expressly contemplates the submission of constitutional amendments; it embodies the constitutional determination that each submitted amendment shall be voted upon separately. Thus, as a matter of logic, any severance of CI-75 could not cure its constitutional defect because the defect lies in the *submission* of CI-75 to the voters of Montana with more than one constitutional amendment.**

**¶26. In Cit. for Pres. of Cit. R. v. Waltermire (1987), 227 Mont. 85, 738 P.2d 1255, this Court concluded:**

There are three ways in which our state constitution may be amended, (1) through legislative referendum (Article XIV, Section 8), (2) through a further constitutional convention (Article XIV, Section 1) or, as in this case, (3) by initiative (Article XIV, Section 9). Although the people of this state have retained the exclusive right of governing themselves, and the right to alter or abolish the constitution or form a government whenever they deem it necessary (Article II, Section 12), it is nonetheless true that as long as the State Constitution is in effect, the people may amend the constitution by initiative only in the manner provided by the constitution. "The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed."

*Waltermire, 227 Mont. at 90-91, 738 P.2d at 1258 (citation omitted). With our holding today we do no more and no less than affirm the clear intent of the people of Montana, as set forth in Montana's Constitution, that constitutional amendments be voted upon separately.*

**¶27. Plaintiffs' request for reasonable attorneys fees and costs is denied. Secretary of State Cooney's motion to dismiss the claim filed against him is rendered moot by this decision.**

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

Justice James C. Nelson specially concurs.

**¶28. I concur in the Court's decision as far as it goes. I would also hold, however, that, in addition to Article VIII, Article II, Section 18 and Article VI, Section 10, CI-75 also clearly amends Article IX, Section 2(2), Article XII, Section 1(2) and Article XIII, Section 2, and thus requires a separate vote on these amendments. I disagree with footnote 2 to the Court's opinion to the extent that it may be read as implying otherwise.**

**¶29. Article IX, Section 2(2) provides:**

The legislature shall provide for a fund, to be known as the resource indemnity trust of the state of Montana, to be funded by such taxes on the extraction of natural resources as the legislature may from time to time impose for that purpose.

This constitutional provision unambiguously requires the legislature to impose taxes on the extraction of natural resources from time to time for the purpose of funding the resource indemnity trust. This constitutional provision also necessarily reposes in the legislature the sole power to determine the nature, frequency and amount of such tax in order to fulfill its constitutional obligation to fund the trust. While CI-75 would apparently not prohibit the legislature from continuing the type and level of taxation for the trust extant at the time CI-75 was adopted, CI-75 clearly would prohibit the legislature from either increasing such tax or changing the nature of the tax (i.e. creating a "new tax") without submitting the increase or new tax to the voters. Such a voting requirement-- backed up by CI-75's supremacy clause --changes the present constitutional scheme by giving the voters veto power over a legislative decision to fund the trust to a greater extent or in a manner different from that presently in existence. The requirements of CI-75 are totally inconsistent with the constitutional obligation of the legislature under Article IX,

Section 2(2), to not only impose, but to determine as well the nature, frequency and amount of the tax in order to fund the resource indemnity trust. Article IX, Section 2(2) in its present form, cannot co-exist with the competing obligations imposed upon the legislature by CI-75. Accordingly, CI-75 amends Article IX, Section 2(2) and this amendment should have been voted upon separately when CI-75 was submitted to the voters.

## ¶30. Similarly, Article XII, Section 1(2) provides:

Special levies may be made on livestock and on agricultural commodities for disease control and indemnification, predator control, and livestock and commodity inspection, protection, research and promotion. Revenue derived shall be used solely for the purposes of the levies.

This constitutional provision empowers the legislature to make certain levies on livestock and agricultural commodities for the various purposes set out. CI-75 amends this constitutional provision on the same rationale discussed above with respect to Article IX, Section 2(2). Pursuant to Article XII, Section 1(2), as Governor Racicot's brief *amicus curiae* demonstrates, the legislature has established a number of fees and has given the Department of Livestock authority to set many of them. Again, while the existing fee structure may be continued, no new, different or increased fee may be imposed by the legislature without voter approval. As with Article IX, Section 2(2), CI-75 effectively strips the legislature of its constitutional power under Article XII, Section 1(2) to determine the nature, frequency and amount of levies which it may choose to impose for the purposes set out in this constitutional provision. This amendment of Article XII, Section 1(2) was required to be separately voted upon by the provisions of Article XIV, Section 11.

## ¶31. Finally, Article XIII, Section 2 is also amended by CI-75. This part of the constitution provides:

**Consumer counsel. The legislature shall provide for an office of consumer counsel which shall have the duty of representing consumer interests in hearings before the public service commission or any other successor agency. The legislature shall provide for the funding of the office of consumer counsel by a special tax on the net income or gross revenues of regulated companies.**

As with its obligation to fund the resource indemnity trust by tax levies, the legislative obligation to provide for and fund, by way of a special tax, the office of consumer counsel

is equally clear. The rationale demonstrating why CI-75 amends Article XIII, Section 2 has already been discussed and will not be reiterated here. Suffice it to say that the amendment to Article XIII, Section 2 imposed by CI-75 was required to be separately voted upon.

**¶32. In summary, I agree with the Court's opinion as far as it goes. I would hold, however, that CI-75 also amended Article IX, Section 2(2), Article XII, Section 1(2) and Article XIII, Section 2, of Montana's Constitution and that Article XIV, Section 11 required a separate vote on these amendments as well.**

/S/ JAMES C. NELSON

Justices Terry N. Trieweiler and William E. Hunt, Sr., join in the foregoing special concurrence.

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

1. [1] We note that there are grounds to doubt whether CI-75's different provisions would meet the test articulated in *Hay*. The Court in *Hay* concluded that "[a]fter all is said, then, the question is an historical one. . . . [A] very brief glance into political history will disclose that the initiative and the referendum [the two parts of the amendment that *Hay* considered] came to us together and at a time when they were considered as essentially complementary. . . . [T]here cannot be the slightest doubt that to the common understanding of our people they presented the aspect of a single plan." *Hay*, 49 Mont. at 408, 142 P. at 214. However, in the present case, Defendants have not shown that CI-75's modification of the governor's veto authority and CI-75's limitation of immunity for public officials and employees have historically been viewed as complementary to plans to restrict government authority to tax.

2. [2] We note that CI-75 also clearly limits the power of the legislature to spend monies as mandated under three parts of Montana's Constitution. CI-75 affects Article IX, Section 2, which directs the legislature to provide for a resource indemnity trust fund. *See* Art. IX, Sec. 2, Mont. Const. CI-75 affects Article XII, Section 1(2), which provides that "[s]pecial levies may be made on livestock and on agricultural commodities." Art. XII, Sec. 1(2), Mont. Const. CI-75 also affects Article XIII, Section 2, which provides that "[t]he legislature shall provide for the funding of the office of consumer counsel." Art. XIII, Sec. 2, Mont. Const.